Our second case of the morning is 4090495, Brewell v. Department of Financial and Professional Regulation for the Apollonis American and the Appellee, Ms. Walsh. You may proceed. Good morning. May it please the Court, we have three primary arguments in our brief, all of which we think are meritorious and deserve your consideration. I'd like to focus on two of those today. The first one that I'd like to focus on is the argument that the Real Estate Act of 2000 does not apply to Carol Brewell, that she does not fall under any of the 11 categories of items that are listed in here. The second one is really in my mind, as I see it, there's really only one of those that arguably applies to her, and that's number seven in the Act. It's the one that speaks to the question of advertising or holding oneself out to advertise the sale of real property. That boils down, I believe, to the question of whether any of the five things that the Department found or concluded, that the Director concluded, had the five reasons that the Director gave for his order. The first one of those is that she took photographs of the real property that were then posted on the CIFSBO website. And it seems to me that that doesn't fall under the category of holding oneself out to sell real estate. That's really just facilitating the dissemination of information. And if the ad itself does not violate the Act, then it's hard to see how the taking of the photographs, which were then posted in those ads, in fact violated the Act. The second point has to do with her bringing yard signs to the property owners. Those yard signs, the Department claims that the yard signs had phone numbers on them. Most of those phone numbers actually were the homeowner's phone numbers, and the yard signs say that the sale of the property was for sale by owner. Then none of the yard signs say anything to the effect that Carol Gruhl was a real estate broker or that CIFSBO was a real estate broker. She aggregated money for the customers, for her customers, who then advertised in the local newspaper. And the Department says that those ads don't comply with the Real Estate Act for the reason that that's practicing real estate, unlicensed real estate in her case. None of the ads actually said that she was a real estate broker, of course, and most of the ads say that the house was for sale by owner, and all she did was bring the money and the ads to the newspaper. It's rather hard to see, in view of the fact that the newspaper ad itself doesn't violate the Act, how aggregating the money and the ads to get a lower cost for her customers violates the Act. She bought time on a radio station, local radio station, and the Department says that that also violates the Act, or that her interviews actually did. I want to go directly to the question of this language that the Department seizes on. They say, she said in some of these ads that she wanted to, quote, sneak one in. And I want to address that directly. Sneaking one in, it was just a way for her to talk and to interest her audience. It wasn't to sell real estate. All that she was doing, and this is the evidence at the hearing, all that she was doing at the time was reading from the ads that were posted on the CIFSPO website. Because she said something like, this is a really cute room or cute house, how could that just be reading from the advertisement? That's what she did. That's all that she did, Judge. She read from the advertisement. Well, when she says, I think this is a really cute room or home, that's not reading from the advertisement, is it? I don't have that particular ad in front of me. But if she said the word, I, then I think probably you're correct in saying that that was not in the ad. But the text of what she said was taken from the ad that was posted. In any event, it's difficult to see how if the ad itself doesn't violate the ad, then how her simply repeating the text or the substance of what's in the ad makes her a real estate broker. The fifth one has to do with, oh, they claim that she was practicing real estate without a license because she knew what was on the CIFSPO website. Well, you can't attribute what's on the website to Carol Gruhl. Even if she knew it, what was on there, it seems to me unfair that she's being held responsible for what may or may not be on the website. And if posting those ads doesn't violate the act, then her knowledge of what's on the website also can't violate the act. We have to remember here that she was a contractor for CIFSPO. And nothing, I believe, that CIFSPO did violates the act. I know that they signed this consent decree. I know that an action was brought against them. And frankly, it was, in my view, maybe a short-term decision but a long-term mistake not to dispute the fact that they were also not violating the act by virtue of their website. Be that as it may, though, you can't attribute what's on the website to Carol Gruhl. She was a contractor. She's one step removed. And nothing that she did, none of those five things, violates the act. It seems to me that what's going on... What about the board specifically concluding that statements in the ads or some of the ads that the plaintiff was not a real estate agent did not change the active role she played both in the ads and in servicing clients outside the ads? I mean, they're not blaming her for the ads. They're blaming her for her activity, sometimes in connection with the ads, sometimes in promoting the ad on the radio show, sometimes in saying we or I. I mean, they made findings of fact and came to certain conclusions. What about those are wrong? About the conclusions? Yeah. Well, the conclusion is wrong for all of those reasons that I just stated. Factually, she did those things that I just mentioned. She took the photograph. She aggregated the ads. She ran the ads to the newspaper. She distributed yard signs. But those things are just things that assist a homeowner in perhaps getting their house ready for sale or for selling. But they don't fall under the 11 categories of items that are in the Real Estate Brokers Act of 2000. And that's the difference. That's where I think the confusion lies. Simply assisting a homeowner isn't the same as practicing real estate as a broker. If that were the case, then the people who actually sell yard signs, I mean, every Home Depot or every Ace Hardware or any of those sorts of places would also have to be brokered. They sell the signs. So if you can sell the signs without being a broker, then why can't you just bring them to the homeowner? If you can put your ad in the newspaper, in the classified ad section of the newspaper, why can't you aggregate? And by the way, if that ad in the newspaper does not violate the Real Estate Brokers Act, why can't you just bring those ads and bring the money from the homeowner to the newspaper's office without having to have a real estate broker's license? That may be assisting the homeowner, but it's not practicing real estate under the Act. Those are different things. Otherwise, all those Home Depots and the newspaper people, they would all require licensing as well, but they don't. And just to do your job to build up your advertising business, which is what she was doing, even during those interviews, by the way, isn't the same as practicing real estate. It doesn't fall under one of those 11 items in the Act. When your client sits on one of the radio shows, and I understand this, we're just talking about a narrow example. We go ahead and put the house on the market. What does that mean? That we includes she and the service she works for, the service she contracts with, plus the homeowner. But the we. We put the house on the market. That is absolutely the opposite of saying, we're over here, the homeowner puts it on the market. We give them a moderate amount of assistance. I think what she said was, she did say we put the house on the market, that is in the record. I think that was just a manner of speaking. I agree. It is a manner of speaking. The question is, is it either misleading or does it broach, cross the line? No, I don't think it does in this case. It appears that no one was confused about what she or CIFSBO did. There were no complaints by homeowners or anyone in the public, which is the class of people who are supposed to be protected by this Act. No one complained. No one said, I was confused. Not even the brokers who brought the complaint against her said that they suffered any injury, that they were confused, that they thought this was confusing. They didn't even make that claim. They never came to the administrative hearing to say so. There's no evidence to that effect. There's not a drop of evidence that anyone in the public was confused. Well, is there a requirement in the Act that someone be harmed by someone engaging in an unlicensed activity? There is no stated requirement that someone be harmed, but the stated purpose of the Act is to protect the public. And the public wasn't injured here. There was no confusion on the part of the public as to what Carol Brewer or even CIFSBO did. Because they always knew that she was not working for a real estate agency, that she was not brokering real estate. They knew that. So even though she may have said at some point some words during the course of some number of interviews that might literally, if taken literally, lead one to believe the opposite, no one really, no one believed that to be the case. And that, I think, is the important point here. Well, if a barber puts up a sign out in front, the barber pole, but the name of the shop is not really a barber shop, and he cuts hair without a license, what's going to happen to that barber? Well, I suppose he'll be asked either to get a license or to remove the sign. Right. Right? And Carol Brewer, by the way, was not given that option here. She wasn't given the option to cease and desist. She wasn't given the option to get a license. Is that in the record? I noticed it was in your brief. That is supported by the record? Well, there is nothing in the record that indicates that she was given the option to cease and desist. It doesn't say that at all. There's nothing there that shows you. Well, does it say that she was not given that option? The negative proposition is not stated that way in the record, no. But I conclude that she was. Well, I know that she wasn't, but as far as the record is concerned, there's nothing in there to show, in fact, that she was given the option to cease and desist. Is there anything that requires the department to give that option before they go ahead with the hearing and sanctions? I know of nothing that requires them to do so. I know that they commonly do, and I know that that would have, again, this is not in the record, and I know that that would have taken care of the whole problem before a $25,000 fine was assessed, but not given the option. They just went to hearing on this. Well, did she ever go to them and say, hey, look, SIFSCO is giving the option to cease if they paid a $7,500 fine and then obtained a license? Did she ever go, is it in the record that she said to the department, this is what you gave my boss or principal, can I have that same opportunity to resolve? I don't believe that's affirmatively in the record. The only thing to that effect that is in the record is the statement by the attorney representing the department at the hearing, at his closing, when he asked for a fine of $7,500. A far cry from $25,000, I suppose, but that's the only thing that I know of to that effect in the record. The other item that I think I'd like to address at this point is the constitutional argument, and I know that there are forfeiture issues concerned with the constitutional argument. It wasn't raised specifically in either the administrative hearing or the circuit court, but I do believe that this court ought to hear and consider that argument in any of it. And I won't repeat the black letter law, of course, that allows the court to do so. But it seems to me that in view of the importance of this issue, which has to do with modern communications among important industries and their customers, that the court ought to look at this. And further, it seems to me that in view of the fact that this court reviews the constitutional arguments de novo, that's all the more reason for the court to overlook any potential forfeiture here. The state does not claim that there's an insufficient record. The state has not claimed that they were unable to mount any kind of defense here. And, in fact, they fully briefed the issue. Their argument in their brief is longer than mine. So it seems that there is, in fact, plenty of grist here for the court to review the constitutional free speech and liberty arguments that are involved in this case. And to make a rule of law here that is consistent with the rest of what's happening in this industry. And I'm pointing, of course, to the opinions that have come out of New Hampshire and California especially. And to allow Carol Gould her right to free speech and to permit her to go forward with the liberty interests she has in earning a living and her occupation. Those are just absolutely essential issues that the court ought to persuade the court, I believe, to overlook the question of forfeiture in this case. The First Amendment issue is vital here. And I think it also speaks at the same time to the question of whether she complied or she falls under the Act. That is the Real Estate Act of 2000. There is the question of whether she was working for, and I use quotes, the word another. And whether she was compensated by another. There is only one court that I'm aware of that has looked at this question. And that's the New Hampshire Federal District Court. And in that case, they said that the website owner did not fall under that New Hampshire Act. Which is substantive. I know that there are factual distinctions, but it's substantively the same as the Act that we're dealing with here. I see my time is up. You'll have more time on rebuttal. Thank you. Good morning, Your Honors. May it please the Court. I'm here on behalf of the Department. There's really just one central question here. And that's whether the Department's decision that what the plaintiff did constituted brokerage is clearly erroneous. And the answer to that question is no. Is the Court, whether it should be affirmed in the answer is yes. And so the Court noticed before she said many things that implied that she was a broker. But perhaps the most important one is found in A560, in which she said, she was asked, well, the photos and the radio spots, aren't those what real estate brokers do? And she said, yes, except I don't get a commission. So to plaintiff, the only difference was that she didn't get a commission after the Act. But in fact, she was compensated. The plaintiff admits that she was compensated for what she did because she got half of the fee that CISPO took for posting these ads. But there are many, many other instances in which she didn't say even as directly, but certainly implied that she and CISPO were acting as real estate brokers. And again, the definition includes both offering to sell, representing oneself as engaged in the business of real estate, and assisting in procuring leads to result in a sale. And so the plaintiff didn't act as Home Depot does and as newspapers do, because those entities are indifferent to the outcome of a sale. Plaintiff clearly was not indifferent. She, as the Court mentioned, she actively pushed the sale of these homes. And for example, she would say, as the Court noted, this is one of my favorites. You know, the ad did not say, surely this is one of Carol Brewer's favorites. She also said in these radio spots, you know, this is one of the prettiest houses I've ever seen. This is, you should really come and look at it. Now those are things that brokers do. Brokers encourage sellers, buyers to come and look at a house that's for sale. She also said things that implied agency, you know, that she was acting as, she and Cisco were acting as an agent for the homeowner. Such as, you know, I help people sell their homes on the Internet. We have houses listed for open houses. We sold half a million last week. We come out and put your house up on the market. We are putting houses up on the market and selling houses. All of those things are things that brokers say. And whether or not she meant to do this, she in fact put out the impression that she was acting as someone who is engaged in the business of real estate. Engaged in these transactions. Now... Did she have any fiduciary relationship with the clients she had? Well, certainly she had a responsibility not to act against their interests. But she... That wasn't really my question. Well, a fiduciary, I mean, to the extent that a fiduciary duty is to act for someone's, in someone's interest, for someone's benefit, is that what you mean by fiduciary interest? And trust. I mean, that she would say, I know about six houses for sale. Or that she would take pictures of houses and just mechanically put them on a website. Or that she would provide CISPO for sale signs with the owner's phone number. I mean, where is the fiduciary relationship between her and whoever contracted with CISPO to use their advertising services? Well, see, this is... This points out the problem of the plaintiff's procedural default. If she had raised this sort of for another argument, then we would have brought in clients and presented evidence to describe the relationship that she had established with these people. But because she never challenged that... Well, isn't it the department's burden to prove that she violated the act? Yes. Okay. Now, where is the evidence of the fiduciary relationship? Well, in what she did, everything she did furthered the interests of the sellers, her clients. So in that regard, yes, I mean, she had the duty to act in their interest because they were her clients and CISPO's clients. Okay. And she did... Let me rephrase. Maybe I don't understand the question. If I wanted to sell my house, which, by the way, I've done on my own before. And I said, well, boy, you know, that website would certainly be handy and it only cost me $100 and they'd give me a couple free yard signs. So I'd call up and say, hey, I want to sell my own house. Give me some yard signs. Come over and take pictures and put them up on the website. And that's the extent of their involvement, basically. Oh, and the added bonus is if the appellant goes on the San Bedonis show now and again and says, oh, we've got some really pretty houses up for sale. What in that contractual relationship, if CISPO or their agent screwed up, could I sue them for? Well, for example, if every single photo they took was like the least flattering photo and it discouraged buyers, for example. I mean, that was part of their duty was to do, if they were taking the photos. I mean, it's one thing if you took your own photos and they put them up. I mean, this is the difference between CISPO and the normal sites. So that sounds like photography malpractice rather than realtor malpractice. Well, again, what realtors do is help people sell their homes. That's their job. That's their relationship with the seller. And here the plaintiff actively helped the sellers. It didn't act as a newspaper. My point is what is missing in the analysis is that realtors, whether they're brokers or agent sellers, have a contractual relationship with the seller of a home or perhaps even a buyer of a home that is a fiduciary relationship. Created by the contract, you mean. Created by the contract. Right. Duties on either side. Right. Okay? Right. That's a much different deal than what was going on here. Right. But the plaintiff acted with a parent agency in that these were the things that she was doing to help out these individual owners. This is the prettiest house I've ever seen. I'm taking the photos for you so that we can put your house on the market. I mean, that's what she said they were doing. So she was creating that sort of relationship. We're putting your house on the market. We're selling your house. We're doing this. I mean, that's what she was saying. And that's what she, in fact, did by taking these photos, by individually highlighting certain homes and giving her own personal description of them. She was representing herself as their agent, pushing their house for sale. Now, whether there was a contractual relationship to do that doesn't matter so much as the parent agency does because that's what she was doing. She was holding herself out as their agent. Did anybody testify that they thought that she was their agent? Well, again, Your Honor, this is the procedural default problem. If we had known that the plaintiff was going to challenge the ---- Whose burden of proof is it? Yes, it's our burden of proof. But we presented evidence to show that she was acting as their parent agency and she never said, no, no, I'm not acting for another for compensation. If she had, we would have presented other evidence. But she didn't, and so we felt that our evidence was enough there. And the circuit court agreed. The department agreed and the circuit court agreed. And so the question is whether that decision is clearly erroneous, and the answer is no because of her apparent agency here. And again, remember, plaintiff herself said, what I do is just like the photos, the spot ads in newspapers. She admitted this in one of the radio spots. What I do is just like what a real estate agent does, except I don't get the commission. To the plaintiff, that was the distinction. That was her defense. And if she didn't raise a different defense, then she can't raise it, certainly not in the appellate court for the first time. I mean, this is one of the problems. And Pravina, the Supreme Court's most recent case on this, Pravina makes clear that if you don't raise a defense in the circuit, in the administrative hearing, you have procedurally defaulted that and you can't raise it in the circuit court, and certainly not in the appellate court for the first time on appeal. There's a small exception for facial challenges. That's what ARVIA, facial constitutional challenges, that's what ARVIA said, particularly when you can't develop the record below. But here, unlike in ARVIA's administrative scheme, there wasn't a limitation on developing the record here. The plaintiff could have raised any defense she wanted. We could have presented evidence on this, and she didn't raise these things, so we didn't feel we needed to present more evidence on this, in our rebuttal case or so. I mean, she presented her sole argument in the administrative hearing was, I'm just like a newspaper. I'm just like Home Depot. I'm just a transmitter of information. And this simply isn't true. Certainly in the radio spots where she says all the things I've just said, and also in the newspaper ads where she calls herself a marketing guru, and she gives only her name and her number for all these open houses. What is someone to think who sees those ads next to the Coldwall Banker ads? Obviously, she appears to be a real estate broker. I mean, it's just that simple. She's putting herself out there to appear to be a real estate broker. Occasionally, not always, as the plaintiff has said, occasionally she would say CISPO is not a real estate broker. But this would happen maybe a tenth of the time. If you look at all the ads, most of the time it just would say, open house, open house, open house. You know, call Carol Gruhl and here's the number. And by doing that, she appeared to be the agent for these sellers. But again, I think really the most damning evidence here was her own admission at the hearing, at page A560, that in fact everything she did was the acts of a broker, except that she didn't get a commission. And if the plaintiff herself admitted that, she surely cannot be saying now that she wasn't a broker. With regard to the procedurally defaulted issues, there are three. One was the for another and for compensation. She obviously obtained compensation because she got half of the fee. And she acted for these people by highlighting their homes, by aggregating the ads for them, benefiting them, assisting them in procuring sellers in this way. Everything she did, not everything, many of the things she did were to assist individual owners and to exhibit an interest in the outcome of the transaction. Unlike a newspaper, which just transmits information, unlike a pure website, which is pure advertising, unlike eBay, unlike Craigslist, the plaintiff exhibited an interest in the outcome of these sales. This is the prettiest house I've ever seen. I've never seen a prettier one. Come and look at it. I mean, all of these things demonstrated that she was acting directly for these sellers, perhaps absent a direct contract like a brokerage contract, but still she was acting as, and had perhaps volunteered, but had the apparent agency to do this. So if she had never gone on San Madonia, we wouldn't be here? I think it would be a much harder case. She wouldn't have admitted that everything she did was brokerage, except that she didn't get a commission. But there still would have been the newspaper ads, and there still would have been the taking of the photographs, and there still would have been the signs in front of houses, which don't say for sale by owner, they say CISPO. So, again, that's the apparent agency, that CISPO is the agent for them. With regard to that question, if I can speak briefly also about the fine here. The fine, the department is not required, as the court asked earlier, the department isn't required to impose the least severe fine for somebody. And, again, plaintiff, unlike the website itself, the plaintiff didn't agree to forego a hearing, didn't agree to get a license, and didn't agree to accept a fine. She went the distance, and when you don't accept a consent order, then the department may fine you. Does the record show she was offered a consent order? No, it doesn't. Well, then how can you say she? We don't know that she asked. If she had asked, believe me, because everything that the department, all the communications that the department receives are in the administrative record. So if she had asked to have a consent order, if she had said, okay, I admit it, I'm going to get a license, can I have the same deal that CISPO had, that letter, that request would be in the administrative record. Its absence from the administrative record indicates that she did not make that request. So, and here, remember, the department found many, many aggravating factors. Plaintiff did, you know. So we want to punish her to the tune of what, $18,000? $25,000. Well, $25,000 minus $7,500 is what I was getting at. I'm sorry?  Oh, I'm sorry. So we're going to punish her about $18,000 in that amount because she didn't request a consent order? Where's the fairness in that? Well, remember, Your Honor, what she did was vastly different from what the actual website did. The website gave passive advice. The website wasn't interactive. The plaintiff said she advised people on how to set their selling price. I almost get the sense that if she had offered the consent order for the $7,500 fine, cease and desist, and if you're going to continue to get a license, the department would have been happy with that. Indeed, the closing argument made by counsel for the department suggests that as well. So my question is, why are we going to penalize her $18,000 just because she went to the hearing? It's not just because of that. The real reason is the aggravating factors that the department listed, which made her different from the website itself. The case law says the act is not a penal measure to be strictly construed against the state, but a broad statutory system which is remedial and therefore should be liberally construed. Do you agree with that? Right. It shouldn't be strictly construed against the state, which means liberally construed for the state. So what we need here, remember the aggravating factors here. She did this hundreds of times. Well, this fine is penal to me, and it's not supposed to be, as I understand it. Well, it certainly creates a remedial scheme. I mean, a fine is almost by its nature a punishment. Any fine, a dollar fine, is a punishment. But it's not supposed to be penal in the sense of criminal. I mean, here, remember what the plaintiff did. She did this hundreds of times. She had hundreds of newspaper ads which listed her name and her number only as representing the sellers. She did these radio ads. And none of her clients, however, complained? Your Honor, as the court indicated earlier, an injury isn't required in order to impose a fine. And remember, what the purpose of the statute is is not just to protect consumers, but it's also to, I mean, not just to protect consumers from misleading, which, of course, these ads were, but misleading statements, but also to protect the public from people who have not been vetted by the Department for trustworthiness and so on, to assure them a level of competence. A $5,000 fine will protect the public more than a $7,500 fine. And it will certainly deter other people from engaging in this sort of conduct, which is inherently misleading. And that's why going to the First Amendment claim, which is also procedurally defaulted and is not a facial claim and so doesn't fall under the exception to the waiver rule for administrative hearings. None of plaintiff's cases that she relies on are administrative law cases where courts will overlook waiver, you know, limitation on the court, not the parties, because as Provena held so recently, this is, you know, the record in the administrative hearing, review of unadministrative review, is limited to the record before the Department. So the Department wasn't able to present evidence, for example, to support its burden, because when there's a First Amendment challenge, of course, the state has to show that, you know, it was narrowly tailored and directly promotes the ends of the act, which include, among other things, deterrence from other people acting as this. But plaintiff's speech doesn't even get to the central Hudson test, because plaintiff's statements were inherently misleading. We sell homes. We sold half a million dollars last week. We put houses on the market. We do all of these things. Those statements are inherently misleading. And because of that, she doesn't even, there's no, the First Amendment is not even implicated. But even if the First Amendment were implicated, and, you know, and we had to address it, because we didn't want to not be heard on the issue, at least in the appellate court, since we didn't have the opportunity to present evidence at the administrative hearing, or in the circuit court even, the central Hudson test is passed here by this act, because it's narrowly tailored to meet the ends, you know, to meet the purposes of the act, which are to protect the public from people who aren't qualified to act as real estate brokers, who aren't qualified, who aren't competent, who haven't gone through continuing education, who haven't been vetted for trustworthiness. And there is an exception for advertising, for newspapers, for pure advertising. What the plaintiff did was not pure advertising. Thank you, counsel. Thank you. We ask that the court affirm. Thank you. American. Justice Appleton, I will answer your question. There was no fiduciary relationship between Carol Gruhl and any of her customers. And, by the way, there was no parent agency either. Parent agency, as I understand it, is a term of art, and as I stand here now, and I don't remember all of the elements that one needs to prove to show a parent agency, but I know just being a commissioned salesman or salesperson is not enough. Stand that on its head for a moment by the department's thinking, every commissioned salesperson would have some apparent agency and a fiduciary duty to the company that's paying them. And that's just not the case. That doesn't happen in the law. It doesn't happen in reality. So that can't be the case. The department has taken great poetic justice, let's call it, with some of the things they maintain that Carol Gruhl said. The bottom line is that everything Carol Gruhl did was always to build her advertising business. It had nothing to do with brokering. I'm sure she never said she was a broker. I'm sure she made, I don't remember the exact quote, frankly, that they're seizing on, but I don't recall that she said that she does things that a broker does. But even if that's the case, it seems to me that a person can do some of the things to assist a homeowner in selling their house without being a broker. And those are the things. And also, by the way, newspapers do that all the time. I know there is a statutory exception for newspapers. But newspapers aren't, as the New Hampshire court and the California court pointed out, they are not just passive classified ad vehicles. They also have other advertisers on their websites that... She had a realtor's license, correct? That's right, she did. So she should know what's within the bounds of the act and what is not. That's right, yes. And that was a factor, I guess we would call it an aggravation, to substantiate the penalty of $25,000. And the whole aggravation issue, I think, is misleading as well, because this act, as stated by the legislature, is for the purpose of protecting the public. It's not supposed to protect real estate brokers from competition. And that's what this was about. They're part of the public, though. Well, they are part of the public, but that's not what this act is directed at. This act is directed at protecting the public from dubious or even criminal activity in connection with the selling and sales of real estate. The purpose of the act is not to protect real estate brokers from new forms of competition. And that's really what was going on here. And I think it's particularly unfair, then, to fine Carol Gruhl $25,000 when, in fact, all that they were really doing here, the people who brought the claim against her, weren't even at the hearing to testify as to any harm. And I think that's particularly unfair. And as a result, I ask that the judgment be reversed and that the $25,000 fine be taken. Thank you, Mr. Chairman.